L98HCalC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  CLAY CALLE JARA, individually
   and on behalf of others
4  similarly situated,

5              Plaintiff,

6         v.                          18 Civ. 2871 (OTW)

7  MANNA 2ND AVE LLC, et al.,
                                      Remote Conference
8
              Defendants.
9
   ------------------------------x
10                                    New York, N.Y.
                                      September 8, 2021
11                                    1:40 p.m.

12 Before:

13                    HON. ONA T. WANG,

14                                    Magistrate  Judge

15                       APPEARANCES

16 SACCO & FILLAS, LLP
        Attorneys for Plaintiffs
17 BY:  CLIFFORD RYAN TUCKER
        -and-
18 MICHAEL FAILLACE & ASSOCIATES, P.C.
   BY:  BRYAN ROBINSON
19
   STEPHEN D. HANS & ASSOCIATES, P.C.
20      Attorneys for Defendants
   BY:  STEPHEN D. HANS
21

22

23

24

25

L98HCalC

1          (The Court and all parties present remotely)

2          THE DEPUTY CLERK:  This is a status conference in

3     18 Civ. 2871, Calle Jara v. Manna 2nd Ave LLC, *et al.*, before

4     the Honorable Ona T. Wang.  Please state your appearances for

5     the record.

6          MR. TUCKER:  Good afternoon.  This is Clifford Tucker.

7     I'm here with Bryan Robinson.  We represent the plaintiff,

8     Calle Jara.

9          MR. HANS:  And this is Stephen D. Hans, from

10    Stephen D. Hans & Associates.  We represent the named

11    defendants.

12         THE COURT:  All right.  Good afternoon, everyone.

13    This is Judge Wang.  Thank you for your patience, as I was

14    doing some final prep for this conference.

15         We are here for a pretrial conference in this case.

16    The trial date is September 22.  We are proceeding by telephone

17    for this pretrial conference due to the COVID-19 pandemic.

18    This is a public line and should be treated like my virtual

19    courtroom.  I expect the same decorum on the line that I expect

20    in my courtroom.

21         The parties should also expect that members of the

22    press or public may be on the line on a listen-only basis.  I

23    have another proceeding set to start at 2:30, so around then

24    you may hear some beeps as they come in.

25         We do have a court reporter on the line, and I know

L98HCalC

1    that she has made herself known to you.  Any recording or

2    rebroadcasting by anyone else on this line is strictly

3    prohibited.  In order for me and the court reporter to hear

4    everyone clearly, everyone on the line is directed to stay on

5    mute when they are not speaking.  Please also say your name

6    when you start speaking so we have a clear transcript, and

7    please do not interrupt each other.

8            Again, if anyone is disconnected, please dial back in

9    as soon as you can.  Everyone remaining on the line will hear a

10    beep when someone disconnects, and so we will wait until we

11    hear that you are back on the line, which is also followed by a

12    beep.  Failure to follow these rules may result in muting,

13    expulsion from the conference, or other sanctions.

14            All right.  So let me see -- make sure we have

15    everybody still.

16            All right.  So on good faith, I am -- good faith does

17    seem to relate to willfulness.  I am considering -- since

18    defendants are not pursuing the statute of limitations defense,

19    I am considering including an advisory question on the verdict

20    form for the jury to determine willfulness because it is a fact

21    that the jury decides, which, in turn, is a prerequisite -- may

22    be a prerequisite to the good faith determination that I

23    understand is for the Court, and that the liquidated damages

24    issue can be pursued via post-trial motions.

25            Does anybody have any disagreement on that or any

L98HCalC

1    other commentary on that?

2         MR. TUCKER:  This is Clifford Tucker, for the

3    plaintiff.

4         No further comment on that.  I would -- I do have

5    comments on other matters, but that one, no.  That's

6    understandable.  Thank you.

7         MR. HANS:  This is Stephen Hans, your Honor.

8         I don't have any further comment on that.  Am I

9    understanding that willfulness will be a jury question,

10   correct, your Honor?

11        THE COURT:  It will be an advisory jury question.

12   It's not a full jury question because, as I understand it,

13   you're not pursuing the statute of limitations defense.

14        MR. HANS:  That's correct.

15        Will there be an instruction to the jury on

16   willfulness?

17        THE COURT:  Yes, and we will get to that when we get

18   to jury instructions.  Yes.  Let's hold that thought until we

19   get to jury instructions.

20        All right.  Next issue I have on my agenda is the

21   motions *in limine* filed by plaintiff yesterday.  One is

22   concerning Mr. Bello's -- whether there should be -- when we

23   should preclude testimony about the reasons for Mr. Bello's

24   termination.

25        So, Mr. Hans, I assume you want to respond to that, or

L98HCalC

1    do you have any agreement on what Mr. Bello will be asked to

2    say about his termination, if anything?

3              MR. HANS:  Well, first of all, I didn't see the

4    motions until I got in at 10 o'clock this morning, so I haven't

5    had a chance to respond to Mr. Tucker nor the Court.  But what

6    I did notice -- and if your Honor wants to give me time on this

7    or if your Honor feels it's unnecessary, what I did notice is

8    that both Mr. McCartney and I stipulated in the JPTO as to what

9    can come out and what can't come out with respect to

10   Mr. DiBello, and that was at the direction of the Court when we

11   were before the Court.  So I haven't had a sufficient time

12   enough to examine Mr. Tucker's motion, but if he's saying that,

13   listen, what we stipulated to after the Court told us, he

14   doesn't want it to come out, you can imagine I have a serious

15   issue with that, since it has been stipulated and it's in the

16   JPTO.

17             With respect to his other motion, I haven't had a

18   chance to digest it, to read it thoroughly, to read his memo

19   because, like I said, I saw it at 10 o'clock this morning.

20             THE COURT:  Thank you for the reminder, Mr. Hans,

21   about Mr. DiBello.  Why don't you -- on that one, yes, I'm not

22   inclined to go back on what was previously stipulated to by

23   Mr. McCartney.  So if there is -- why don't I have you and new

24   plaintiff's counsel meet and confer on whether this motion *in*

25   *limine* is attempting to cover the same ground or change

L98HCalC

1    something in the stipulations.  I will warn you now I'm not

2    inclined to go back on the agreement that is in -- gosh, I just

3    had it up before me.  This is -- I believe it's 150-1.  Is that

4    the recent one?

5            Yes, in 150-1, paragraph 23, is that what you're

6    talking about, Mr. -- oh, paragraph 22 and 23.

7            OK.  So take a look at that.  And, Mr. Hans, your

8    response will be due on September 15 --

9            MR. HANS:  OK.

10           THE COURT:  -- as to both.  So let me just get that

11   date in now.

12           On issue No. 2, this is about the kitchen schedules.

13   So, Mr. Tucker or Mr. Robinson, let me ask you first, why now

14   and why are you essentially seeking a sanction for something

15   that should have been dealt with in discovery two years ago?

16   What does the currently produced samples or examples show?

17           MR. TUCKER:  So we demand in all cases like this

18   evidence to show the schedules for the plaintiff's work periods

19   that may have any bearing on his executive status.  In this

20   case, the defendants -- during the course of discovery, we had

21   to depose the defendants twice because they did not produce

22   records at various times, didn't produce interrogatory

23   responses at various times, and our second deposition of

24   defendant occurred essentially on the last day of discovery.

25   And I asked specifically, are these all the kitchen schedules?

L98HCalC

1    She said no.  She had not performed a diligence search.  She

2    was urged to perform a diligence search, and no further records

3    came out, even though we know that there are other records that

4    would be relevant to the case.

5         At that point we had extended discovery several times

6    to resolve the issues, and nothing further could be done in

7    this regard.  The defendants now basically have done -- they've

8    produced a sampling of the schedules, while not having produced

9    all the records in response to discovery demands.

10        THE COURT:  OK.  I'm going to stop you right now.

11   When you say defendants have produced samples or examples, was

12   this that they just now produced them and turned them over or

13   are these samples and examples that had been produced when

14   discovery was open?

15        MR. TUCKER:  When discovery was open.

16        THE COURT:  What do those sample and examples show?

17   And I'm assuming that no more schedules have been produced

18   since discovery closed.

19        MR. TUCKER:  Correct.

20        THE COURT:  Part one is easy.  There will be no more

21   other schedules introduced, OK, other than the samples and

22   examples that have been produced to date.

23        MR. TUCKER:  Right.  So, essentially, the missing

24   schedules are ones that were signed by Igor Segota or anyone

25   else who the defendants believe were in a management capacity,

L98HCalC

1   the plaintiff or Ms. Pedrignani herself, and they were

2   handwritten.  The difference here is the examples that the

3   defendants produced are typed printed out, but that's not how

4   they were generated, it appears.  And when we asked, why didn't

5   you search for the other schedules, the complete schedules that

6   they claim my client created in his managing capacity, the

7   answer was it was just voluminous, I guess, or something to

8   that effect.  It was not "we couldn't find them" or "we did

9   everything we could to find them but couldn't get them."  It

10  was essentially, you know, just a deliberate refusal.

11          So what we have is a situation where we have only we

12  have missing puzzle pieces here as a result of the refusal to

13  provide them, and the puzzle pieces are important to see the

14  whole picture.  So we believe, at a minimum, the jury should be

15  advised as to what inference they may be able to draw as a

16  result of this kind of -- of this situation.

17          MR. HANS:  Stephen Hans, your Honor.  May I respond?

18          THE COURT:  Yes, go ahead.

19          MR. HANS:  Yes.  I believe, and I don't have her

20  testimony in front of me and she's out of the country right

21  now, but I believe her testimony was we may or may not have the

22  written schedules anymore because they were always transposed

23  into the computer and issued, and here is what we found.  And

24  that was sufficient at the time.  They said this reflects the

25  schedules for the period that we're giving you.  We will check

L98HCalC

1    to see if we have any handwritten.  Of course, I found out that

2    she does not have any.

3          I would stipulate with Mr. Tucker that I will not

4    introduce any handwritten schedules or any further schedules,

5    but we gave him what we could find.  I'm pretty sure that was

6    the answer.  Now, had he wanted a stipulation or wanted me to

7    look or try to find all the written schedules back in the day,

8    when we were doing this, I would have done that.  This is the

9    first time I'm really hearing anything about we want all the

10   typewritten schedules.  I'm not even sure they exist.  The

11   restaurants have been closed for quite some time due to the

12   pandemic, and my client's records are -- she's had to move out

13   of New York because she couldn't afford to live in the city

14   anymore.

15         So I don't even know if they do exist, but I'd be

16   happy to stipulate that I will not introduce one single piece

17   of paper other than what was introduced at the deposition and

18   agreed to in the JPTO.  It was all agreed in the JPTO that

19   these schedules would be introduced by not only the

20   plaintiffs -- not only the defendant but the plaintiff also.

21         THE COURT:  So here's a high level ruling on this.  If

22   you -- and I will leave you until September 15 to see if this

23   covers it, OK?  You're not introducing -- nobody's introducing

24   any new kitchen schedules that haven't already been introduced.

25   I'm not giving you an adverse inference instruction on missing

L98HCalC

1     schedules.  I will not let this trial turn into a trial on

2     spoliation, on an issue that potentially may go to one factor

3     of Mr. Calle Jara's authority.  I'm not going to let this be a

4     trial on defendant's document retention practices or anything

5     like that.  I will cut that off very quickly, OK.

6          Oh, gosh.  Let me make sure -- I think we can we might

7     have lost Mr. Tucker, so let's just wait a second.

8          (Recess)

9          MR. TUCKER:  Sorry, I was disconnected.

10          THE COURT:  No problem.  I'm glad I have a conference

11     monitor.  We didn't say anything.

12          MR. TUCKER:  OK.

13          THE COURT:  I was in the middle of my ruling.

14          So there will be no new kitchen schedules produced or

15     introduced at trial, period.  If it was produced in discovery,

16     it can be introduced as an exhibit.  Discovery closed years

17     ago, so there will be nothing new.

18          I will not allow this to be a trial on spoliation.  I

19     will not allow this to be a trial on documents -- defendant's

20     document retention or retention practices or defendant's -- the

21     diligence of defendants searching for documents.  The time for

22     that has passed along ago.  OK.  So we're not going to do that.

23     I'm going to cut off questioning once it starts to get into

24     their practices and their search.  OK?  You're not getting an

25     adverse inference ruling either.

L98HCalC

1          MR. TUCKER:  May I be heard on this to make a point?

2          THE COURT:  Sure.

3          MR. TUCKER:  The defendants testified about -- and

4    here's why it's important -- one of the factors of many is

5    whether my clients created these schedules or whether somebody

6    else with actual more authority, Mr. Segota, created these

7    schedules.

8          THE COURT:  Well, Mr. Segota, Mr. Pedrignani,

9    Mr. Calle Jara -- and this is Mr. Tucker, right?

10         MR. TUCKER:  Correct.

11         THE COURT:  You need to state your name for the court

12   reporter.

13         MR. TUCKER:  Correct.

14         THE COURT:  They're all testifying.  You can ask them

15   the same questions.  And you know what?  You're free to impeach

16   based on -- with their deposition testimony, but you are not

17   getting an adverse inference instruction.

18         MR. TUCKER:  That's fine.  I just wanted to know the

19   scope of the questions that I'm allowed to ask on the subject.

20         THE COURT:  Yes.

21         MR. TUCKER:  So I'm still entitled to inquire about

22   the other schedules, etc.?

23         THE COURT:  If others exist, but once it starts

24   looking like you're suggesting that there should be some

25   determination or that the jury should infer that the missing

L98HCalC

1    schedules would be in your favor, I'm not going to allow it.

2    OK?

3            MR. TUCKER:  Your Honor, if I may, I want to make

4    clear to the Court that the missing schedules included

5    Mr. Segota's signature which indicates his approval of them and

6    therefore his authority, not my client's.  So the jury needs to

7    hear that these --

8            THE COURT:  You can ask that of Mr. Segota, right, did

9    he sign schedules, approve schedules?

10            MR. TUCKER:  Correct.

11            THE COURT:  Right.  OK.  What about the ones that were

12    produced?  Who approved those, as far as you can tell?  Whose

13    handwriting is on those?

14            MR. TUCKER:  There's no handwriting.  It's a printout.

15            THE COURT:  All right.  OK.  And there's nothing that

16    indicates who approved those schedules or anything like that?

17            MR. TUCKER:  No, it's printed by the defendants.

18            MR. HANS:  Your Honor, Stephen Hans.  If I --

19            MR. TUCKER:  Of course, there's going to be debate

20    about it.  So Mr. Hans is going to say, well, my client

21    approved them.

22            THE COURT:  Why don't we let Mr. Hans say what he's

23    going to say instead of you telling me what Mr. Hans is going

24    to say.  He's on the line right now, too.

25            MR. TUCKER:  Sure.

L98HCalC

1          THE COURT:  Go ahead, Mr. Hans.

2          MR. HANS:  Judge, there is plenty of testimony that

3   Mr. Segota occasionally, not all the time, but he would sign

4   the schedules.  Sometimes he didn't; sometimes he did.  And I

5   don't have his testimony in front of me, but there was a body

6   of questions asked by Mr. Tucker of Ms. Pedrignani and

7   Mr. Segota in the deposition on who created the schedules, how

8   did they go from the handwritten to the printed and signed and

9   all of that.  That was all developed at a lengthy part in the

10  deposition.

11         THE COURT:  OK.  I'm assuming the witnesses will

12  likely testify consistently with what they said in deposition

13  or they face potential impeachment.

14         All right.  Mr. Hans, if there is anything that is

15  still open about these issues of these kitchen schedules, feel

16  free to include it in your responsive brief on September 15,

17  but I'm going to assume that this is -- this should be worked

18  out between the two of you, as the Bello testimony should be

19  worked out consistent with what was in the last JPTO.  OK?  But

20  I will look to your response on the 15th.

21         MR. TUCKER:  Question, Judge.

22         THE COURT:  Yes.

23         MR. TUCKER:  The response on the 15th, should that be

24  affidavit or affirmation form or can that be by letter?

25         THE COURT:  Let's call it a letter brief.  If there's

L98HCalC

| 1 | things that need to be attested to, I expect you to do what --

| 2 | to include exhibits.  OK?

| 3 |         MR. TUCKER:  Yes, your Honor.

| 4 |         THE COURT:  Moving on to the issue of witnesses, we

| 5 | got a call yesterday from Mr. Hans about what Ms. Pedrignani

| 6 | must do to attend the trial.  She must attend the trial.  If

| 7 | she doesn't show up, I may find the defendants in default.  The

| 8 | parties are responsible, everybody.  I think this brings to

| 9 | mind this issue.  Parties are responsible for keeping up to

| 10 | date with the court's entry protocols.  OK?  And that includes

| 11 | being able to answer the questionnaire appropriately so that

| 12 | they can come in.

| 13 |         If necessary, you should have a contingency plan for

| 14 | them to testify by video if something happens.  If that becomes

| 15 | the case, for example, if somebody gets sick, we may need to

| 16 | switch up the order of the witnesses in order to make the

| 17 | testimony by video possible.  OK?

| 18 |         Any tech-related logistics, whether it's publication

| 19 | of exhibits or anything else or video testimony, should be

| 20 | worked out with the court's AV department.  Their email address

| 21 | is av_nysd@nysd.uscourts.gov.

| 22 |         MR. TUCKER:  I'm sorry.  I couldn't hear the first few

| 23 | letters.

| 24 |         THE COURT:  Av_nysd, and everything after the "@" is

| 25 | the same as my chambers email address.

L98HCalC

1          And this warning goes for everybody.  If you don't

2     have a reason why a witness doesn't or can't show up, why a

3     party doesn't or can't show up for trial and testify when their

4     supposed to, I will either find the party in default or dismiss

5     for failure to prosecute.  We're too close to trial at this

6     point for people to be sloppy about making sure that their

7     witnesses show up when they need to show up.  OK.

8          All right.  Similarly, you're in charge of arranging

9     your own interpreters, so make sure you do that, if an

10    interpreter is necessary.

11         All right.  Next is calling custodians to authenticate

12    or lay a foundation for admission of evidence.  I expect you

13    all to deal with authentication issues before the trial, so

14    we'll talk about that when we get to exhibits, which is the

15    next thing on my agenda.

16         Are we having any deposition designations?  I think at

17    the last conference we weren't 100 percent sure that we were.

18         MR. HANS:  Your Honor, this is Stephen Hans.

19         When you say "depositions," are you talking about for

20    impeachment or if the witness is not coming?

21         THE COURT:  If the witness is not coming.

22         MR. HANS:  Well, the only two depositions from myself

23    are of Mr. Segota and Ms. Pedrignani, and they will both be

24    there.

25         MR. TUCKER:  This is Clifford Tucker.

L98HCalC

1          Our only deposition is for Mr. Jara.  We expect him to

2     be there as well, so I don't believe there's going to be any

3     designations on our part.

4          THE COURT:  OK.  Is Mr. DiBello going to show up?  Is

5     there a potential issue if he doesn't show up, whether you're

6     going to introduce -- whether you're going to use his

7     deposition designations, which, by the way, would also clarify,

8     I think, some of the motions *in limine* by the plaintiffs?

9          MR. TUCKER:  Right.  I'm not sure yet on that part.

10    We don't represent him, so we don't control him.  But that one

11    I'm not sure about.  I think if he shows up, then he'll be

12    there.  If he doesn't, I don't expect the deposition

13    designation.  But I think part of that question turns on the

14    Court's decision on the motion *in limine*.

15         MR. HANS:  Your Honor, I have a question, Stephen

16    Hans.

17         Actually, I have two questions.  One is if he doesn't

18    show up, obviously, his deposition -- part of his deposition

19    will be read to the jury.  I was thinking today, and subject to

20    what the Court thinks and what Mr. Tucker thinks, that it

21    wouldn't be a bad idea if Mr. Tucker and I conference with each

22    other as to what parts of that deposition would be read,

23    because some of it was a lot of colloquy between counsel, some

24    of it was inflammatory, some of it was accusatory, some of the

25    deposition is not relevant.  So, I mean, I would like to think

L98HCalC

1    that the parties could somehow conference with each other and

2    say, OK.  This -- this will be read in, and both parties agree.

3    There are parts of it I don't like.  It's got to go in.  But

4    there's lots in that deposition that I think are -- I regret

5    some of the things that are in there.  No bad words or

6    anything, but we were at each other on that.  And I just think

7    that the lawyers should look to a higher level to try to

8    identify what should be said to the jury.

9         And the second thing is if that is the case, then the

10   stipulation Mr. McCartney and I came to, which was in

11   anticipation of Mr. DiBello not coming, should be told to the

12   jury by the Court.  That's just my opinion.

13        MR. TUCKER:  This is Clifford Tucker, for the

14   plaintiff, your Honor.

15        I'd be happy to meet and confer with Mr. Hans on this

16   point, and see what we'll do.  I think I understand his point

17   about the stip.  I have to take a look at it and talk to

18   Mr. Hans, and I can take a look at the deposition testimony to

19   see what Mr. Hans' concerned about.  Obviously, I think

20   colloquy between counsel, that's not necessarily relevant to

21   the issues, but it's the kind of thing that at sidebar or

22   something else we can certainly discuss that.  That's different

23   than witness testimony, obviously.

24        THE COURT:  Yes.  I might take it one step further,

25   and I'm going to put it out there, since you both seem to be

L98HCalC

1  willing to conference with each other and think about

2  depositions designations for Mr. DiBello.  I would be more than

3  happy to kill two birds with one stone and deal with

4  plaintiff's motions *in limine* and the uncertainty of whether

5  Mr. DiBello decides to show up and what he might decide to say

6  or not say on the stand by asking you to consider and

7  reconsider whether you really need him and whether the trial

8  would proceed more smoothly and more swiftly if you could agree

9  to deposition designations and not have him come for live

10  testimony at all.

11      It seems to me that both sides get -- have some degree

12  of risk and uncertainty if Mr. DiBello comes and testifies in

13  person and that there is only -- and that you might both be

14  better served by having the jury not be distracted by

15  Mr. DiBello's case and only focus on the actual probative

16  questions and answers that he gave in his deposition.

17      MR. HANS:  Your Honor, Stephen Hans.

18      I agree, and I think -- I have incredible respect for

19  Mr. Tucker.  I think we could together cobble together the

20  relevant stuff that could be read to the jury and go that way,

21  but it was very clear to your Honor on August 26, and

22  Mr. McCartney and I struggled and grappled with what we would

23  say about Mr. DiBello's issues with the plaintiff.  So the only

24  thing that I would want after Mr. Tucker and I successfully

25  identify the testimony is that Court can read that stipulation

L98HCalC

1    out that Mr. McCartney and I agreed to or however your Honor

2    wants to do it.

3          On the other hand, I happen to agree with your Honor,

4    if Mr. DiBello never comes and we just say no Mr. DiBello, I'm

5    fine with that also.  But if there's going to be testimony read

6    and it's very, very adverse to me, I would want that

7    stipulation that we agreed to out there for the jury to hear.

8          MR. TUCKER:  I'd be happy to have a meet-and-confer on

9    it so I can have a look at the stipulation, your Honor -- this

10   is Clifford Tucker, for the plaintiff, by the way -- and see

11   what we can do on that point and try to narrow it as much as

12   possible.

13         THE COURT:  Why don't you try to figure this issue out

14   by September 15 also.

15         MR. TUCKER:  OK.

16         THE COURT:  And the reason for this is think about how

17   much of a distraction it would be if you want to call

18   Mr. DiBello and he doesn't show up or if he does show up and he

19   goes completely in the other direction and is equally bad to

20   both of you or you're taking a risk that he's going to be --

21   he's just going to create a huge distraction to the jury on

22   Mr. Calle Jara's case.  OK.

23         Then think about if that were to happen and you'd need

24   to either impeach or try to come up with or try to salvage some

25   probative parts of what Mr. DiBello has to say by having to

L98HCalC

1    pivot during trial to come up with deposition designations,

2    either because he doesn't show up at all or he shows up and is

3    completely unmanageable, and we decide that we need to break

4    and we're not -- we're going to go by deposition designations.

5    Think about whether you want to be dealing with that during

6    trial or trying to kind of address that issue before trial and

7    take that out of the mix.  I have a feeling that you'll be

8    dealing with a lot of unexpected stuff as it is, and having

9    Mr. DiBello as a live witness who could distract the jury from

10   the points that both of you are trying to make, you might be

11   better served by trying to find a stipulation and/or together

12   with deposition designations that could be read to the jury in

13   a much more neutral manner.  OK?

14           But why don't you think about this and discuss by

15   September 15 how much you really want Mr. DiBello to appear in

16   person and how you want to address the risk that he doesn't

17   show up or he shows up and he's a completely loose canon.  OK?

18           MR. TUCKER:  Understood.

19           MR. HANS:  OK, your Honor.

20           THE COURT:  All right.  Let's move on to exhibits.

21           MR. ROBINSON:  Your Honor, I'm sorry.  This is Bryan

22   Robinson on behalf of the plaintiffs.

23           THE COURT:  Yes.

24           MR. ROBINSON:  I submitted another motion about an

25   hour prior to this meeting, and, of course, I would like to

L98HCalC

1  afford Mr. Hans the opportunity to respond.  However --

2           THE COURT:  His response to that is due September 15

3  as well.

4           MR. ROBINSON:  OK.

5           THE COURT:  I didn't see it either.  It's not really

6  great timing to submit a motion *in limine* an hour before a

7  conference and expect to be heard.

8           MR. ROBINSON:  I agree.  I agree, your Honor.  My

9  apologies.

10          But it is in regards to the letter that Mr. Hans

11  submitted to the Court regarding the good faith argument, and

12  he also specified that his client, Ms. Pedrignani, is going to

13  testify as to information obtained from counsel.  Now, that

14  would put Mr. Hans as a potential witness and direct conflict.

15  So I need to know, what can we do about that?  Is that

16  testimony now going to come in?  None of this was specified in

17  the JPTO.

18          MR. HANS:  Your Honor, may I respond?

19          THE COURT:  Sure, go ahead.  I'm concerned about the

20  waiver of attorney-client privilege, and I'm not sure that this

21  is where you might want to go, Mr. Hans.

22          MR. HANS:  Ms. Pedrignani is not going to testify, nor

23  did she testify in the deposition, that she ever got any advice

24  from me regarding to the way she did business at her

25  restaurants.  In fact, I didn't even know her during the time

L98HCalC

1    she was dealing with Mr. Calle Jara.  I met her several years

2    later.  She testifies in her deposition that she did not get

3    any advice or any guidance.  I wasn't her attorney then.  I

4    became her attorney in 2016 on a Department of Labor case, and

5    that was it.  She never consulted me on how to run her

6    restaurants, exemptness, anything else, and I explained that to

7    counsel this morning.

8           I explained to counsel a few weeks ago when we

9    discussed this that if you look at the deposition testimony,

10   she does not identify me as anybody she got advice from or

11   talked to.  And I am saying to the Court, and I'll be happy to

12   submit an affirmation to that effect, that I've never spoken to

13   her about how she should do business, what she should do,

14   exemptness, guidance, or anything else with respect to how she

15   could treat employees.

16           MR. ROBINSON:  Your Honor, if I may, this is Bryan

17   Robinson on behalf of the plaintiffs.

18           The only issue with that is that Mr. Hans did specify

19   in that letter that he has been her attorney for years and that

20   she will testify as to information obtained from counsel.  Now,

21   that being Mr. Hans.  So that can be, in and of itself, treated

22   as a waiver.  So I need to know if Mr. Hans is going to be

23   disqualified, if his client going to move forward with him.

24           MR. HANS:  Let me just try to -- (cross-talk)

25           THE COURT:  I don't understand -- wait.  Stop, both of

L98HCalC

1    you.

2          I don't understand why this would be a

3    disqualification of Mr. Hans if Mr. Hans is saying he never

4    provided advice.  Now, what this does bring to bear is whether

5    you would be trying to call whoever the attorney is that

6    Ms. Pedrignani claims that she relied on.

7          MR. TUCKER:  This is Clifford Tucker, for the

8    plaintiff, your Honor.

9          That is one of the major issues in this motion.  So

10   Ms. Pedrignani testified she didn't get advice from Mr. Hans

11   and she didn't get advice from counsel on Mr. Jara.  Now, on

12   top of that, she didn't disclose any names or contact

13   information of any other lawyers in her Rule 26 initial

14   disclosures, and in response to interrogatories, she never

15   identified any lawyers who could be witnesses regarding her

16   receipt of legal advice on the FLSA and good faith compliance.

17         Now, defense counsel filed a letter stating she's

18   going to talk about advice she got from counsel.  Whoever this

19   counsel may be in defense counsel letter, I first thought was,

20   is it Mr. Hans?  Mr. Hans says it's not him.  Fine.  Well, who

21   is it?  Because now we're in a situation where there's never

22   been any disclosure of any kind or even suggestion that she got

23   any advice, and she could come in and say it was Clarence

24   Darrow, Abraham Lincoln, I mean, any -- choose your best lawyer

25   in town, and she could do that.

L98HCalC

1          MR. HANS:  Your Honor, Stephen Hans.

2          What the question was, is did she receive any advice

3     from counsel?  If she testifies that years back she spoke to

4     attorneys about how to run this or how to run that, she may not

5     be able to identify, and I know she couldn't when we did

6     discovery, who she spoke to.  But through her years, many years

7     of running restaurants, she's spoken to lawyers, she's spoken

8     to restaurateurs, she's spoken to restaurant associations

9     members.  That's where she was going on this.  The follow-up

10    questions were never asked in the deposition.

11         With respect to Mr. Calle Jara, I will stipulate that

12    she didn't get any advice with respect to Mr. Calle Jara from

13    any attorney.  That I will agree to.  Whether she's talked to

14    attorneys years before that or something, you know, I don't

15    know what she's going to say because that question was never

16    asked of her.

17         MR. TUCKER:  Your Honor.

18         MR. ROBINSON:  Go ahead.

19         MR. TUCKER:  This is Clifford talker.

20         One final point.  The good faith issue, if you note

21    the case law in our motion *in limine*, when a defendant submits

22    an affirmative defense of good faith, they waive

23    attorney-client privilege because they have to prove that they

24    took affirmative steps to learn the FLSA and apply it.  Now,

25    the defendant was asked questions about whether she got

L98HCalC

```
1    counsel, she was asked whether she has witnesses in her
2    interrogatories, and she's required to introduce witnesses in
3    Rule 26 initial disclosures.  She did not identify a single
4    person, let alone a single lawyer -- excuse me, she did not
5    identify a single lawyer that she relied on to learn -- to take
6    affirmative steps to learn the FLSA.  And as a result, the
7    disclosure comes as a complete surprise, and that's why the
8    defendant should be prohibited from providing this kind of
9    testimony.  It's because it goes to the --
10             THE COURT:  I mean, I'm not as worked up as you all
11   are about this because the good faith issue relates to
12   liquidated damages, which is for the Court in post-trial
13   briefing.
14             I have to tell you that if you look at the case law,
15   and my clerk certainly has, unspecified statements that I
16   relied on something that somebody told me, but I can't tell you
17   who it was or when it was or specifically what they told me
18   isn't going to be enough to show good faith.  But I'm also
19   not -- I'm also less concerned about that because, in this case
20   and because of the procedural posture of this case and what
21   we're actually putting to the jury, the good faith issue's
22   going to be for me to determine through post-trial briefing if
23   liability is found, and I'm not -- I'm less concerned about
24   that.
25             Does anybody have a major disagreement with that
```

L98HCalC

1    point?

2          MR. ROBINSON:  This is Bryan Robinson.

3          No, your Honor.  There's just the issue, again, that

4    defense counsel specified that she was going to testify as to

5    information that came from counsel.  That was one part.  And

6    then the second part is to information obtained from counsel

7    during the Department of Labor audit.  Now, if Mr. Hans is

8    happy to stipulate that both of those issues, that they will

9    not be mentioned, I'm happy with that result.

10          MR. HANS:  This is Stephen Hans, your Honor.

11          She may testify what she learned, not from me and not

12   from counsel, what she learned as a result of the Department of

13   Labor audit.  But she will not testify I learned from my

14   counsel, blah, blah, blah, and she will never testify she

15   learned anything from me.

16          THE COURT:  OK.  So we're not disqualifying Mr. Hans.

17   I don't know why this wouldn't be fertile ground for

18   impeachment by plaintiff's counsel anyway if she's going to go

19   down that road.  So it seems like it would go to

20   Ms. Pedrignani's credibility more than anything else, but -- or

21   equally as to the substance.  It would go equally as to the

22   substance of what she says about this reliance as well as to

23   her credibility on the good faith issue.

24          So do you want to conference and also respond by

25   September 15, Mr. Hans?

L98HCalC

| 1 | MR. HANS:  On September 15, I will submit an |

 1      MR. HANS:  On September 15, I will submit an

 2 appropriate statement that I will not be -- that my client will

 3 not be identifying me, nor will I be offering any evidence or

 4 any testimony that we knew or know of an attorney that she

 5 spoke to and definitely not me.  I will put that in an

 6 affirmation.

 7      THE COURT:  OK.

 8      MR. ROBINSON:  Just if I could ask Mr. Hans a direct

 9 question, your Honor?  Bryan Robinson.

10      THE COURT:  Go ahead.

11      MR. ROBINSON:  Mr. Hans, were you the attorney during

12 the Department of Labor audit?

13      MR. HANS:  Yes, I was.  But she is not -- in the

14 statement that I'm going to supply to the Court, Bryan, I'm

15 going to put in there that she did not learn anything from me

16 as a result of the Department of Labor audit.  I'm taking out

17 this lawyer advice from everything.  You know, what she

18 testifies after that, I don't know.  I can't tell you.  I don't

19 think it's going to be much, I can tell you that.

20      MR. TUCKER:  Perhaps an affirmation from

21 Ms. Pedrignani might make sense.

22      MR. HANS:  I'm sorry.  I didn't hear that.

23      MR. TUCKER:  If the affirmation comes from counsel,

24 it's less probative on the issue than from Ms. Pedrignani

25 herself.

L98HCalC

1          MR. ROBINSON:  Yes.  And just to add to that, I

2     believe the privilege holder would be Ms. Pedrignani.

3          MR. TUCKER:  Exactly.

4          MR. HANS:  The problem is, your Honor, is that these

5     are questions, they're good questions.  They should have been

6     asked in Ms. Pedrignani's deposition, and they weren't.  They

7     only asked, did you learn anything about Mr. Calle~Jara from

8     counsel, and she said no, and she will stick to that answer.  I

9     mean, if there was follow-up, did you ever learn anything in

10    the past or anything like that, they didn't ask that question.

11    And she cannot identify, nor could she in her discovery,

12    identify any one particular person.  So I just don't understand

13    why we're still discussing it.

14         MR. ROBINSON:  There is the issue, because

15    Mr. Clifford -- I'm sorry, this is Bryan Robinson -- as

16    Mr. Clifford previously mentioned, this is an affirmative

17    defense to the good faith argument.  Yes, I understand it will

18    not be put to the jury.  However, this is tied in with the

19    willfulness argument, so that's why I'm confused.

20         THE COURT:  Well, and I'm saying that this probably

21    wouldn't -- it probably wouldn't carry the day anyway.  And if

22    she can't even come up with a name of any -- if she can't even

23    come up with a name of somebody that she talked to, I just

24    don't even know how -- again, I'm concerned that we're just

25    getting distracted by this.  How does this not collapse into --

L98HCalC

1    say you had a –- you have a car accident case and somebody

2    says, oh, well, somebody said that the light had turned green,

3    but I hadn't looked, but somebody told me the light had turned

4    green.  I don't know who it was.

5            MR. TUCKER:  Right.

6            THE COURT:  Doesn't it just ultimately collapse to an

7    issue as simple as that?

8            MR. TUCKER:  It could, your Honor.  This is Clifford

9    Tucker.

10           It could, your Honor, and I would respectfully request

11   that if there is a response, that the privilege holder

12   themselves should provide that statement in this respect.  So

13   Mr. Hans offered to provide the affidavit stating that she

14   didn't get any advice from himself or whoever else.  As long as

15   Ms. Pedrignani signs it, I think that would show –- allay many

16   of these concerns, avoid a lot of these issues.

17           MR. HANS:  Your Honor, Stephen Hans.

18           No, that's not what I'm saying.  I haven't talked to

19   her about that.  She's a woman that's been involved in the

20   restaurant industry for quite some time.  I don't know who

21   she's talked to and who she doesn't, and she may have talked to

22   people years back.  And, again, as your Honor --

23           THE COURT:  I think, Mr. Hans, the affirmation is

24   going to be if I got any advice from anybody, counsel or

25   anybody in the industry, it wasn't from Mr. Hans, and I don't

L98HCalC

1    remember who it was.

2            MR. HANS:  That's fine.

3            THE COURT:  Right?  OK.  How much time do you need to

4    get that?

5            (Cross-talk)

6            MR. HANS:  Allow me to speak.

7            She will sign something, sworn statement, that she

8    didn't receive any advice from me and that whatever she heard

9    was from others and other people in the industry, but she

10   cannot identify -- well, if she does identify anybody -- see, I

11   don't know what she's going to say, because the question was

12   never asked.  But I doubt she will identify one person or

13   something like that.

14           Judge, I'm a little hesitant to have to have my client

15   kind of start signing all kinds of things of what she will and

16   what she won't testify because then it turns into a pretrial

17   deposition type thing.  I mean, it gets a little -- we're

18   preparing for trial.  I'm happy to say she will not testify it

19   was me.  I'm happy to say that she never got any advice or the

20   advice that she may have gotten was not from any attorney that

21   she can identify by name, but if she was at a conference, and

22   I'm just making this up --

23           THE COURT:  OK.  Let me interrupt you for now,

24   Mr. Hans, because this brings us full circle.  Why is it not

25   fine for her to testify to that when she's on the stand?

L98HCalC

 1              MR. HANS:  I think it's fine for her to testify to it.

 2              MR. TUCKER:  If she doesn't know who it is, the issue

 3      is -- the issue is we had submitted Rule 26(a) --

 4              THE COURT:  I get it.  Wait.  Stop, Mr. Tucker.  I

 5      told you I had another proceeding at 2:30.  I understand

 6      they're on the line right now, so they're listening to

 7      everything that's going on here.  All right.

 8              But she is going to testify at trial because if she

 9      doesn't show up, they are going to be in default.  OK?  You

10      have counsel, Mr. Hans, as an officer of the court

11      representing, in essence, that if she claims that she relies --

12      that she relied on information from others, that it wasn't from

13      Mr. Hans, which --

14              MR. HANS:  Absolutely.

15              THE COURT:  -- I'm guessing she's going to say under

16      oath when she testifies at trial if the issue even comes up.

17      You have additionally that even if she could identify somebody,

18      she didn't identify anybody pretrial or in her 26(a)

19      disclosures or at deposition or anything else.  So, clearly,

20      there's not going to be a witness.  Which then gets to the

21      point of good faith and willfulness -- well, good faith is the

22      only sort of intent of defendants that's being considered here,

23      and that's an issue for the Court in post-trial motions.  And

24      I've already told you all, and as you all well know because of

25      the case law that exists out there, that if that's what

L98HCalC

 1   Ms. Pedrignani says, it's not going to carry the day anyway.

 2         So what is the issue here?

 3         MR. ROBINSON:  Your Honor, if I may, I'm sorry.  This

 4   is Bryan Robinson.

 5         So it has to come tied together.  The Department of

 6   Labor audit, she was obviously represented by counsel, and

 7   Mr. Hans has stated it was him.  So that information cannot

 8   come in as well, so I believe Mr. -- Ms. Pedrignani should do

 9   an affidavit as to that as well, to any information obtained

10   from counsel and any information obtained as a result of the

11   audit or --

12         THE COURT:  No, no.

13         MR. ROBINSON:  -- reporting the audit.

14         THE COURT:  No, no.  OK.  You can question her at

15   trial.  There's no new witnesses who are coming in.  OK.  We're

16   not.  We're not doing this.  OK.  If something completely

17   bizarre plops out that we didn't cover today in all of our

18   hypotheticals, we'll deal with it.

19         MR. ROBINSON:  Understood.

20         THE COURT:  All right.  Exhibits.

21         MR. HANS:  Your Honor.

22         THE COURT:  Yes.

23         MR. HANS:  Your Honor, I know you have another

24   conference waiting and there are a bunch of other issues,

25   should we -- in deference to your conference, should we

L98HCalC

1    continue this maybe tomorrow or later today?

2        THE COURT:  Oh, hello.  I'm sorry.  I was talking on

3    mute.  I think we can -- I think I'll try to minute finish up

4    in the next ten minutes or so.  OK.  And if we can't get -- if

5    we can't finish, I expect that we'll probably have to have

6    another conference sometime after -- sometime on the 20th or

7    the 21st, if not before then.

8        MR. HANS:  Your Honor, could I possibly submit a

9    letter to the Court as to the issues that maybe you can rule

10   on, Mr. Tucker can comment on?  Because as I prepare for this

11   thing, I'd like to know how I'm preparing.  So there are about

12   two or three issues that are going to take longer than probably

13   ten minutes, and I don't want to intrude on your schedule.

14       THE COURT:  OK.  Why don't you identify for me what

15   they are, because they might be on my agenda, and I might have

16   spotted something already, and if not, we'll definitely get to

17   them.

18       OK.  What are they?

19       MR. HANS:  Well, the first issue is my September 3

20   letter.  I brought up about extra voir dire proposals and

21   questions with respect to voir dire.

22       The second issue is, since I have the burden of proof

23   on the affirmative defense of executive exemption, I'd like to

24   be able to, and there was some law on this, tell the jury, you

25   know, what I'm going to do, what I have to prove, and that was

L98HCalC

1   part of it.

2          The other thing is the exhibits.  All the exhibits,

3   since they're 8 1/2 by 11 pages, should we have enough copies

4   for the entire jury or are they going to pass them around?

5          And the last one is does the Court want us to provide

6   not only the Court with a copy of the deposition for

7   impeachment but with the witness also?  So that's kind of a

8   Gatling gun of my issues.

9          THE COURT:  Let's see if I can get through them in the

10  next ten minutes, because they do kind of line up with my

11  agenda.

12         Exhibits, I need a binder.  I need an exhibit binder

13  by September 15.  It's not clear from the JPTO whether there

14  are still objections to any of the exhibits.  If so, you need

15  to try to work them out.

16         MR. TUCKER:  I think we can.

17         THE COURT:  And if they're not worked out, there will

18  be a separate section in the binder with a short letter brief

19  or something setting out what the objection is.  This also goes

20  back to what -- goes back to the authentication issue that was

21  still open in the last JPTO also.  Deal with the authentication

22  issues, submit to me a binder of proposed agreed-upon exhibits

23  by September 15.  OK?

24         If you fail to object by then to any of the proposed

25  exhibits, those objections may be deemed waived.  OK?  Oh,

L98HCalC

1  actually, let's make that -- let's make September 17 the

2  exhibit binder.  OK.

3          The exhibit binder, that should also include the

4  stipulation of facts, which should not be a heavy lift because

5  I think you already did that in the JPTO.  You just need to

6  make a new document that has a case caption on it and that is

7  signed so that it can be read to the jury and that can then be

8  an exhibit for the jury.

9          OK.  So make sure you include the stipulation of facts

10  as an exhibit in the exhibit binder.  Does that make sense?

11          MR. TUCKER:  Yes, your Honor.

12          MR. HANS:  Yes.

13          THE COURT:  Extra voir dire proposals, we'll take a

14  look at that.  We will handle the questions ourselves by

15  questionnaire, and we'll do a -- we can have another

16  conference.  One of our closer in time pretrial conferences

17  will address that.  OK?

18          MR. HANS:  You're talking about the issues in my

19  letter of September 3?

20          THE COURT:  Yes, and generally about the voir dire.

21          The verdict sheet, looking at the last JPTO, I think

22  only part one and part three remain on the verdict sheet.  OK.

23          September 17 is also your due date for revised

24  proposed jury instructions.  All right.  I know that there

25  should be one jury instruction on the executive exemption that

L98HCalC

1    discusses each factor or sub-element of the executive

2    exemption.  Right now, I think you've included both the FLSA

3    and New York Law executive exemption instructions.  Work it

4    out.  Try to come up with one.  I'm not going to read two

5    separate instructions.  I think that's really confusing.

6          Similarly, the willfulness, as I said, we'll submit to

7    the jury for an advisory verdict, advisory finding.  Again, try

8    to harmonize the FLSA and New York Labor Law instructions and

9    agree to a proposed instruction.

10          Similarly, there's other instructions on the burden of

11    proof, and, also, I think in the prior jury instructions,

12    you've included both the FLSA and New York Labor Law pattern

13    jury instructions.  Pick one or harmonize, agree, resubmit.

14    OK.  That's September 17.

15          Also, while you're there, delete the ones that are --

16    that you've already agreed are not necessary, including things

17    like overtime, spread of hours, violation of the wage statement

18    provisions, and so on.

19          I will point you back to ECF 149 and ECF 154 that had

20    previously instructed you to try to work out your differences,

21    submit redlines, tell me much more clearly what's still

22    objected to, what can be taken out.  Look at those for

23    guidance.  OK?  I need new ones by September 17.  We'll

24    probably have a charging conference sometime after trial is

25    underway and we're nearing the end of trial.  My expectation is

L98HCalC

1    that we might either break earlier one day and let the jurors

2    go home early or we'll just stay later at the end of a trial

3    day to go through -- to have a full-blown charging conference,

4    but that day will go much more smoothly the more prep you do

5    now.  OK?

6              MR. TUCKER:  Understood, your Honor.

7              MR. HANS:  Yes, understood, your Honor.

8              MR. ROBINSON:  Yes, your Honor.

9              THE COURT:  All right.  Let's see.  Does that hit --

10   oh, and then, yes, exhibit binder for the whole jury, for each

11   member of the jury, because we probably prefer not to have

12   people passing things around or looking over each other's

13   shoulders given the pandemic that we are still in.  OK?

14             MR. TUCKER:  All right.

15             MR. HANS:  Understood, your Honor.

16             MR. ROBINSON:  Understood.

17             THE COURT:  Any other questions right now?

18             MR. TUCKER:  I'm afraid I have one other point.  It's

19   horrible, I know.  My wife is moving through the citizenship

20   process, and the government has required my wife and I to

21   attend a citizenship interview on the 23rd at approximately

22   12 o'clock.  I'm expecting it to last approximately two hours,

23   and I'm told it's like right around the corner in another

24   federal office.

25             Would it be a tremendous problem to take a long lunch

L98HCalC

| | |
|---|---|
| 1 | that day so that I can run over and attend to that matter? |
| 2 | Normally, I would -- I told them I have a federal judge who |
| 3 | doesn't want this, and I'm told that they will not adjourn |
| 4 | this.  It's a big risk for her. |
| 5 | THE COURT:  That's fine.  That's fine.  And, |
| 6 | hopefully, congratulations to you and your wife -- |
| 7 | MR. TUCKER:  Thank you. |
| 8 | THE COURT:  -- on the citizenship process. |
| 9 | MR. TUCKER:  Thank you. |
| 10 | THE COURT:  Yes, we will take a longer lunch.  We'll |
| 11 | try to -- we will have to schedule it and stagger it.  That |
| 12 | said, if it does take longer, you and Mr. Robinson should make |
| 13 | contingency plans, right? |
| 14 | MR. TUCKER:  Understood. |
| 15 | THE COURT:  We'll take a longer lunch.  If for some |
| 16 | reason you get held up or they run behind, because who knows |
| 17 | how -- I've not heard of any federal office ever running behind |
| 18 | schedule -- that Mr. Robinson should be prepared to take over |
| 19 | for you, or we could, depending on where we are in the trial, |
| 20 | move a defense witness up or something like that. |
| 21 | OK.  So make sure that Mr. Robinson is prepped to |
| 22 | handle anything, can take over if there's any delays.  OK? |
| 23 | MR. TUCKER:  Understood. |
| 24 | MR. ROBINSON:  Yes, your Honor. |
| 25 | MR. HANS:  Judge, let the record reflect that the |

L98HCalC

1    defendant has absolutely no objection, and congratulations,

2    counsel.

3            MR. TUCKER:  Thank you.

4            THE COURT:  All right.  And if she wants to attend the

5    trial after the citizenship interview, if she has nothing

6    better to do, she is certainly welcome.

7            MR. TUCKER:  That would depend on how I'm doing.

8            THE COURT:  OK.  All right.  We will look at -- so I

9    want to go over the deadlines, although I know that you will

10   order a copy of the transcript so you have this all to look

11   back on.

12           MR. TUCKER:  Yes.

13           THE COURT:  So September 15, deadline for responses

14   and updates on any of the motions *in limine*, and September 17

15   for the exhibit binder, the stipulation of facts, which will be

16   its own exhibit, and updated jury instructions.  And I think

17   September 15 is also the date I'd like to see if you can agree

18   that you will proceed with Mr. DiBello by deposition

19   designation instead of live testimony.  OK?

20           MR. TUCKER:  Understood.

21           MR. HANS:  Yes, your Honor.

22           MR. TUCKER:  Thank you.

23           THE COURT:  Then after we get all of that, we'll

24   set -- did we set time for September 20 and September 21 yet?

25           MR. TUCKER:  No.

L98HCalC

1          THE COURT:  OK.  Let's do that now.  Let's look at the

2    morning of the 20th and -- let's look at the morning of the

3    20th, and then I might move some things around and make some

4    more time on the 21st, if necessary, too.

5          OK.  So let's say 10 a.m. on the 20th, and you should

6    hold the 21st open as well in case we need to move some things

7    around and prep.  OK?

8          MR. HANS:  Thank you, your Honor.

9          MR. TUCKER:  Understood.  Thank you.

10          THE COURT:  All right.  Anything else?

11          MR. HANS:  No, your Honor.

12          MR. ROBINSON:  No, your Honor.  Thank you.

13          THE COURT:  All right.  Please get a copy of the

14    transcript ASAP so that you are not working in the dark and

15    working blind and based on your recollection and your notes.

16    OK?

17          MR. HANS:  Yes, your Honor.

18          MR. TUCKER:  Understood, your Honor.  May I bring one

19    point to the Court's attention?  I'm so sorry.

20          THE COURT:  Yes.

21          MR. TUCKER:  The parties are going to, I expect, and I

22    don't think I'll hear on objection on this, the parties are

23    stipulating to essentially everything except the executive

24    exemption.  If there's a plaintiff's verdict, we would submit

25    to the Court to calculate the damages at that point.  Would

L98HCalC

1    that be a problem, or does the Court need anything additional

2    on that?

3              THE COURT:  I thought you already agreed to the

4    damages.

5              MR. HANS:  I thought so, too.

6              MR. TUCKER:  We did.  OK.  Fantastic.  I just wanted

7    to make sure there was no other issue on that.

8              THE COURT:  All right.  Thank you very much.  We will

9    see you, I assume, for an in-person conference on the 20th in

10   the morning.  OK.

11             MR. TUCKER:  Thank you, your Honor.

12             MR. HANS:  Thank you.

13             THE COURT:  Great.  Thank you very much.  We are

14   adjourned.

15             MR. ROBINSON:  Thank you, your Honor.

16             (Adjourned)

17

18

19

20

21

22

23

24

25